NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | |
| Zhejiang Topoint Photovoltaic Co., Ltd. | : | CASE NO. 14-24549(GMB) |
| | : | |
| Debtors | : | O P I N I O N |
| | : | |

APPEARANCES:   Douglas G. Leney, Esq.
               Archer & Greiner, P.C.
               One Centennial Square
               Haddonfield, NJ 08033
               Attorney for Debtors

               Jason M. Sweny, Esq.
               Nguyen Chen LLP
               11200 Westheimer, Suite 120
               Houston, TX 77042
               Attorney for Debtors

               Damien O. Del Duca, Esq.
               Del Duca Lewis, LLC
               21 East Euclid Avenue, Suite 100
               Haddonfield, NJ 08033
               Attorney for H2 Contracting, LLC/Hessert Construction

               Richard A. Barkasy, Esq.
               Schnader Harrison Segal & Lewis, LLP.
               Woodland Falls Corporate Park
               220 Lake Drive East, Suite 200
               Cherry Hill, NJ 08002-1165
               Attorney for H2 Contracting, LLC/Hessert Construction

**FILED**

JAMES J. WALDRON, CLERK

**May 12, 2015**

U.S. Bankruptcy Court
Camden, NJ

Theresa O'Brien
Judicial Assistant to Judge Burns

I.  **INTRODUCTION**

Before the Court is a dispute between the Debtors, Zhejiang Topoint Photovoltaic Co., Ltd., *et al.*[1] ("Debtors"), and third parties H2 Contracting LLC and Hessert Construction NJ LLC (collectively, "Hessert"), regarding the ownership of certain assets. Hessert disputes the Debtors' asserted ownership of 7.34 megawatts, or MW, of solar panels in storage at a warehouse located in New Jersey, arguing that the panels belong to certain limited liability corporations which were created by the Debtors.

II. **FACTS and BACKGROUND**

On July 16, 2014, the Debtors each filed in this Court petitions for recognition of their foreign proceeding pursuant to Title 11 of the United States Code (hereinafter, the "Bankruptcy Code" or "Code"), Chapter 15. The Debtors' motion for joint administration was granted on July 23, 2014 under Case No. 14-24549.

The Debtors were in the business of constructing and operating solar farms at all times relevant to the instant matter. In the context of this business, the Debtors and their affiliates executed on October 25, 2011, a Joint Venture Agreement (hereinafter, the "JV Agreement") with an entity known as CleanLight Power + Energy LLC and its affiliates (hereinafter, "CleanLight"). Under the JV Agreement, the Debtors planned to construct two solar farms—one in Gloucester Township, New Jersey and another in Mansfield, New Jersey (individually referred to as the "Gloucester Project" and the "Mansfield Project" and collectively as the "Projects"). Hessert was named in the JV Agreement as the construction contractors for the Projects.

A goal of the parties to the JV Agreement was to take advantage of certain tax grants from the United States Government. Under the JV Agreement, this purpose was to be carried out by two special purpose vehicles, Topoint CL Mansfield, LLC (the Mansfield SPV) and Topoint CL Gloucester, LLC (the Gloucester SPV) (collectively, the "SPVs"). As the JV Agreement stated, in Article III, Paragraph 4(a), that "[t]he Parties shall use their best efforts to ensure that each SPV will be able to obtain the benefit of all government tax and renewable energy credits."

---

[1] The Debtors include Zhejiang Photovoltaic Co., Ltd. (Case No. 14-24549), Zhejiang Jiutai New Energy Co., Ltd. (14-24555), Zhejiang Yutai Solar Materials Co., Ltd. (14-24557), and Zhejiang Winsolar Photoelectric Materials Co., Ltd. (14-24559).

Pursuant to the terms of the JV Agreement, the Debtors and CleanLight agreed to create the SPVs.

Accordingly, on the same date the JV Agreement was executed—October 25, 2011—certificates of formation were filed for each of the SPVs and Andy Fei ("Fei") was named Manager and CEO of the SPVs. CleanLight and the Debtors agreed in the JV Agreement that the Debtors would retain a 90% ownership interest in the SPVs and would hold the exclusive right to appoint, remove, and replace any officers, directors, and managers of each SPV. Thus, the interests of the SPVs and the Debtors are, for all intents and purposes, intertwined and identical to one another.

According to the JV Agreement, Article III, Paragraph 6(d), the Debtors "would contribute to the SPV[s] all funds necessary to purchase all solar panels from [the Debtors] for the Project at a price of $1.60 per watt." Solergy LLC ("Solergy")—an entity of which Fei is also a principal—served as a middleman for the transaction, providing warehousing services for the Debtors and SPVs and delivering payments for the panels from the SPVs to the Debtors. From the end of 2011 through the first half of 2012, according to the testimony of Fei, the Debtors shipped a substantial volume of solar panels into the United States to Solergy at a warehouse in Bridgeton, New Jersey. Though no documentation of a sale exists, such as a bill of lading, Fei confirmed in his testimony that between December 22, 2011 and April 26, 2012, the SPVs combined to pay $11,745,000 to Solergy and Solergy shortly thereafter paid $10,077,000 to the Debtors. Fei also confirmed that when the SPVs paid $11,745,000 to Solergy and with Solergy then transferring the majority of that payment to the Debtors, the SPVs were purchasing solar panels at $1.60 per watt. Thus, as Hessert alleges, if panels were purchased at $1.60 per watt and $11,745,000 was expended, that would calculate to 7,340,625 watts—or 7.34 megawatts ("MW")—being purchased by the SPVs.

Hessert is requesting determination that the panels belong to the SPVs, rather than the Debtors, because Hessert filed a breach of contract suit against each of the SPVs and seeks to ensure the SPVs have assets to satisfy any judgment it obtains.[2] The law suit arose because

---

[2] While it does not affect the legal analysis contained in this Opinion, since this matter was heard on November 20, 2014, Hessert has obtained final judgments by default against both special purpose vehicles in the aggregate amount of $5,757,057.00. On April 15, 2015, a judgment in the amount of $2,640,687.00 was entered against the Gloucester SPV. On April 29, 2015, a judgment in the amount of $3,116,370.00 was entered against the Mansfield SPV.

Hessert had entered into contracts with the SPVs to provide construction and design services to the SPVs in connection with the Projects, and after the Projects failed, Hessert asserted that the SPVs breached their contracts and owe damages to Hessert. Thus, Hessert filed suit in the Superior Court in Burlington County.

The disposition of the solar panels is of critical importance to Hessert because of its litigation against the SPVs. The SPVs own no assets other than the panels in question. Accordingly, if the panels are considered property of the Debtors' estate, Hessert will be left empty handed despite its state court claims.

Here, in the Chapter 15 proceeding, the SPVs have not asserted an ownership interest in the panels. Because the SPVs purportedly have no other assets to satisfy any judgments, Hessert initially objected to the recognition of the Debtors' foreign proceeding, arguing that a proper determination as to the ownership of the aforementioned panels must be conducted prior to the panels being sold in China. A Consent Order entered on August 12, 2014 (the "Consent Order"), partially resolved Hessert's objection and ordered that 5 MW of panels shall be set aside (the "Set Aside Panels") as security for Hessert's claims.

Based on the aforementioned calculations, Hessert asserts that the SPVs own 7.34 MW of the warehoused panels, and in turn seeks a determination that not only the Set Aside Panels belong to the SPVs, but also the additional 2.34 MW remaining beyond the 5 MW of Set Aside Panels. At a hearing on November 20, 2014 (the "November 20th Hearing"), counsel for the Debtors indicated that while the Debtors are actively trying to sell the warehoused panels, the Set Aside Panels indeed remain set aside, and implied that to the extent there is a determination in Hessert's favor of an additional "2.34 or 2.4" MW, that Hessert is "adequately protected."

However, the Debtors argue that Hessert lacks standing to bring the instant objection. The Debtors assert that Hessert is merely a creditor of the Debtors' creditors, the SPVs. According to the Debtors, the actual parties in interest would be the SPVs and Hessert possesses no right to assert the claims of the SPVs on the SPVs' behalf. The Debtors also raised at the November 20th Hearing, for the first time, that Hessert's position that the SPVs own the panels in question is incorrect, arguing among other things that no physical delivery of the panels took place and that the SPVs were not a party to the JV Agreement and that, therefore, a sale was never consummated under the applicable provisions of the Uniform Commercial Code ("UCC").

4

**III. STANDING**

It is worthwhile to note that the prior Consent Order resolving Hessert's objections to the recognition of the Debtors' proceeding expressly preserved Hessert's rights, and provided that the warehoused panels would be set aside and that "Hessert may assert any claims or interests in and against the Set Aside Panels." Hessert argues that the Consent Order resolved any issue as to standing. As Counsel for Hessert points out, bankruptcy courts will generally respect the validity of an order asserting standing. See In re Congoleum Corp., 362 B.R. 167, 173-74 (Bankr. D.N.J. 2007) (refusing to deviate from court's prior determination that debtor's insurers, who were not creditors of the debtor, had standing to object to the debtor's plan). That said, in the case Hessert refers to, In re Congoleum Corp., the court itself actually made a determination with respect to the standing order in question. Despite Hessert's assertion that the instant Consent Order explicitly grants Hessert standing in this matter, this Court never made a determination that Hessert has standing when signing the Consent Order.

At issue here is Code § 1522(a), which states that "[t]he court may grant relief [to the debtor] . . . only if the interests of the creditors *or other interested entities,* including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (emphasis added). Though there is limited case law on the issue of which parties are considered "other interested entities" under § 1522(a), the Southern District of New York's Bankruptcy Court acknowledged that the purpose of § 1522(a) is:

> [T]o ensure a balance between the relief that may be granted to the foreign representative and the interests of the *persons potentially affected by such relief* . . . Section 1522 gives the bankruptcy court *broad latitude to mold relief to meet specific circumstances*, including appropriate response if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors.

In re Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012) (emphasis added; internal marks and citations omitted). See also In re International Banking Corp., B.S.C., 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (noting that the interests of "persons that may be affected" must be considered and that the bankruptcy court has "broad latitude to mold relief to

5

meet specific circumstances"). These courts' seemingly intentional usage of the word, "persons," rather than the word, "creditors," implies that § 1522(a) is to be construed broadly.

Given the limited case law on the issue, the Court must turn to interpretations of other provisions of the Code in which similar language—particularly, "party in interest"—is utilized with respect to the issue of standing. The Third Circuit has explained, in the context of § 1109(b),[3] that the phrase "party in interest" is to be "construed broadly to permit parties affected by a Chapter 11 proceeding to appear and be heard," and that "courts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985). Based on this language alone, it is clear that on the facts of the instant matter that Hessert has a clear stake in the instant Chapter 15 proceeding. Hessert has an interest in ensuring that the SPVs maintain ownership of the panels in question, however, because the SPVs are not pursuing their own interests in the case, Hessert cannot protect its interests unless it is allowed to participate in this proceeding.

In fact, under circumstances somewhat similar to those in the instant matter, the Maryland Bankruptcy Court considered a non-creditor to be a party in interest for the purposes of § 1121(c).[4] In re River Bend-Oxford Associates, 114 B.R. 111, 114-15 (Bankr. D. Md. 1990). To summarize, River Bend-Oxford involved a debtor company that could not file a plan during the exclusive period because of internal disagreements between its two general partners—an entity by the name of River Bend Partners and the managing partner of River Bend Partners. Id. The latter general partner of the debtor filed a plan after the exclusive period; River Bend Partners, on the other hand, could not file a competing plan because its partners—which included the other general partner of the debtor—were also in disagreement as to the future course of the debtor. Id. at 114. The court noted that River Bend Partners had a direct interest in the debtor and was entitled to act for the interests of its dissenting partners, but was unable to act. Id. at 116. With that in mind, the court determined that because their distribution rights were affected

---

[3] Code § 1109(b) generally allows any "party in interest" to be heard in a Chapter 11 case. See 11 U.S.C. § 1109(b). The Section also provides a list of examples, including "[t]he debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee . . . ." Id. This list is not meant to be exhaustive, however. In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985).

[4] Code § 1121(c) allows any "party in interest" to file a plan, and provides the same list and language as § 1109(b).

*and there was a lack of representation of their interests*, the dissenting partners of River Bend Partners was a "party in interest" with a right to file a competing plan. Id. at 115.

Courts have held that a judgment creditor of a creditor in a bankruptcy case is not a "real party in interest" with respect to the *debtor's* case, and therefore lacks standing. In re Tour Train Partnership, 15 B.R. 401, 402 (Bankr. D. Vt. 1981) (denying a judgment creditor of a creditor standing to seek relief from stay against the debtor to protect its potential assets). This concept has been consistently applied in the context of motions for relief from stay. See id.; see also In re Comcoach Corp., 698 F.2d 571 (2d Cir. 1983). In Comcoach, for instance, the court determined that a mortgagee, who was not a creditor of the debtor, was not a party in interest for the purposes of seeking relief from stay because the debtor had no obligation to the mortgagee but simply owed rents to the landlord-mortgagor. In re Comcoach Corp., 698 F.2d at 574-75. As the court noted while interpreting § 362, "the real party in interest is the one who, under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit." Id. at 573 (internal marks omitted). Similarly, in the context of a third-party's challenge to a lease assignment, one district court emphasized that a creditor of a creditor could not make such a challenge against the debtor, noting that "[s]uch a party may be deeply concerned about the bankruptcy proceeding . . . [b]ut the party's legal rights and interests can only be asserted against the debtor's creditor, not against the debtor . . . ." ; Southern Blvd., Inc. v. Martin Paint Stores, 207 B.R. 57, 61 (S.D.N.Y. 1997).[5]

There are distinguishing characteristics between these cases and the instant case. For example, the Court of Appeals noted in Comcoach that the non-party mortgagee in its case was not left without a remedy because it could appoint a receiver in its state court action, and the receiver would subsequently have rights as a party in interest for various reasons.[6] In re Comcoach Corp., 698 F.2d at 574. Moreover, in Southern Blvd., the court explained that the creditor-of-a-creditor's interests in challenging a lease assignment were represented adequately

---

[5] Of course, the Southern Blvd. Court cited to Comcoach in coming to this conclusion, and the law of Comcoach—a Second Circuit Court of Appeals decision—is binding upon the District Court for the Southern District of New York. See Southern Blvd., 207 B.R. at 61.

[6] The River Bend-Oxford Court explicitly referenced this distinguishing characteristic in coming to the determination that the dissenting partners in its case had standing largely due to a lack of representation of their interests. In re River Bend-Oxford Associates, 114 B.R. at 115.

7

enough by the objections raised by the creditor directly involved with the lease.  Southern Blvd., 207 B.R. at 62.

The Southern Blvd. Court came to this determination while deciding whether the creditor of a creditor should be allowed to intervene pursuant to F.R.B.P. 2018(a), which provides that "[i]n a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  Id. at 62; F.R.B.P. 2018(a).  While the Southern Blvd. Court ultimately decided the non-party's interests were adequately represented via the creditor's own objections, it did note that the factors to be considered for the purposes of permissive intervention include "whether intervention would result in undue delay or prejudice, *and whether the proposed intervenor's interests are adequately represented by a party already in the present case.*"  Southern Blvd., 207 B.R. at 62 (emphasis added).

Accordingly, the reasoning of the River Bend-Oxford decision seems most applicable to the facts of the instant matter.  Just as the analogous provisions of Chapter 11 are to be construed broadly, Code § 1522(a) is meant to be construed broadly so as to protect the interests of affected parties.  Just as in River Bend-Oxford, where the third parties' interests were not being adequately represented, Hessert's interests in the instant matter are not being adequately represented.  In River Bend-Oxford, the third parties lacked representation because the entity which had a direct right in the bankruptcy case to assert those interests was sitting idly due to various conflicts of interests.  In our case, a conflict exists because the SPVs were created by the Debtors for the limited purpose of facilitating the Projects here in the United States, and are almost entirely owned and completely controlled by the Debtors.  Since a determination that the panels belong to the SPVs would go against the Debtors' interests, it would also go against the SPVs interests.  Hessert, however, has an interest in ensuring the SPVs maintain ownership of the panels so that its state court claims can be satisfied. Hessert's interest therefore lacks representation because the SPVs, which hold the direct rights against the Debtors, are sitting idly and will not enforce their own rights against the Debtors.

While the factual circumstances of the instant matter are by no means identical to those of the River Bend-Oxford case, the reasoning behind River Bend-Oxford that the parties' interests were not being represented is undeniably applicable here.  This conclusion is not meant to ignore the obvious analogy to be made between the instant matter and the aforementioned

8

cases which denied standing to creditors of creditors; indeed, Hessert is essentially an unsatisfied creditor of the directly interested parties. This conclusion simply recognizes that the Third Circuit has, in other contexts, reasoned that the determination as to standing should be made on a case by case basis, and that § 1522(a) is designed to give bankruptcy courts "broad latitude to mold relief to meet [the] specific circumstances" of "the persons potentially affected by such relief." In re Amatex Corp., 755 F.2d at 1042 (for Third Circuit reference); In re Cozumel Caribe, S.A. de C.V., 482 B.R. at 108. Given that Hessert's interests are not otherwise being protected by the entities that maintain the direct right to protect said interests, this Court should mold its relief to meet the specific circumstances of this case by granting Hessert standing.

Furthermore, as noted above, in deciding whether to allow permissive intervention by "any interested entity" under F.R.B.P. 2018(a), a primary factor is whether the intervening party's interests are adequately represented by a party in the case. F.R.B.P. 2018(a); Southern Blvd., 207 B.R. at 62. The same line of reasoning as to why the River Bend-Oxford rationale applies would therefore lead to the conclusion that permissive intervention could apply here, serving as further support for allowing Hessert to be heard. Not to mention, there is a striking similarity between the language of F.R.B.P. 2018(a) and § 1522(a). Both provisions utilize the phrase, "interested *entity [or entities]*," rather than "interested *party*" or "*party* in interest." F.R.B.P. 2018(a) ("[T]he court may permit *any interested entity* to intervene . . . .") (emphasis added); 11 U.S.C. § 1522(a) ("The court may grant relief . . . only if there interests of the creditors and *other interested entities*, including the debtor, are protected.") (emphasis added). It would logically flow that the standard applied to "any interested entity" under F.R.B.P. 2018(a) could be equally applicable to "other interested entities" under § 1522(a)—allowing an entity to be heard where its interests are not already being adequately represented.

For all of the foregoing reasons, Hessert properly has standing to be heard on the issue before the Court, lest its interests would otherwise lack representation.

## IV.  DISCUSSION

There are three key issues here, as the Debtors argue that no transfer occurred because, essentially, (1) the panels are not fungibles, (2) the panels were never identified and (3) no physical delivery was made, so therefore title never could have passed from the Debtors to the SPVs. As will be explained below, this Court rejects the Debtors' argument.

This matter is governed by the New Jersey Uniform Commercial Code (hereinafter, "UCC").[7] The UCC applies to the sale of goods—which are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Docteroff v. Barra Corp. of America, Inc., 282 N.J. Super 230, 238 (App. Div. 1995) (citing N.J.S.A. 12A:2-102 and quoting N.J.S.A. 12A:2-105(1)). Neither the Debtors nor Hessert refute that the panels in question in this matter are goods.

Under the UCC, a sale involves "the passing of title from the seller to the buyer for a price." N.J.S.A. 12A:2-106(1). The passing of title cannot occur until the goods have been identified to the contract. N.J.S.A. 12A:2-401(1). It is therefore necessary to first address whether the panels were sufficiently identified before ultimately deciding whether title to the goods passed from the Debtors to the SPVs.

### A. Identification

It is clear here that the panels in question are fungible goods and were identified to the JV Agreement accordingly. The "general policy is to resolve all doubts in favor of identification." N.J.S.A. 12A:2-501, UCC Comment 2. Moreover, given "the limited function of identification there is no requirement in this section that the goods be in a deliverable state or that all of the seller's duties with respect to processing of the goods be completed in order that identification occur." Id., UCC Comment 4. Identification, according to the relevant provisions of N.J.S.A. 12A:2-501, is made (a) when the contract is made if it is for the sale of goods already existing and identified or (b) if the contract is for the sale of future goods, when the goods are shipped, marked, or otherwise designated by the seller as the goods to which the contract refers. N.J.S.A. 12A:2-501(1)(a)-(b).

According to the UCC, "[a]n undivided share in an identified bulk of fungible goods is sufficiently identified to be sold although the quantity of the bulk is not determined." N.J.S.A. 12A:2-105(4); see also Henry Heide, Inc. v. Atlantic Mut. Ins. Co., 363 N.Y.S.2d 515, 518 (N.Y. Sup. Ct. 1975) (referencing a transaction involving a bulk of sugar that had not been physically delivered and stating, "[t]he mere making of the contract with reference to an undivided share in

---

[7] The Debtors cite to the N.J. codification of the U.C.C. in its brief while Hessert cites to the U.C.C. itself. Because the provisions substantially mirror one another, this Opinion only refers to the N.J. codification for the sake of convenience and continuity.

an identified fungible bulk is enough . . . to effectuate an identification if there is no explicit agreement otherwise . . . the failure to segregate is of no consequence"). With respect to fungible goods, the fact that a seller may remove or sell some of the fungibles only to later replace them does not undercut the policy favoring identification, as this sort of conduct is particularly natural with respect to fungible goods. Martin Marietta Corp. v. New Jersey Nat'l Bank, 612 F.2d 745, 751 (3d Cir. 1979).

According to Black's Law Dictionary, fungibles are "goods which are identical with others of the same nature, such as grain and oil . . . [or] common shares of the same company." Black's Law Dictionary 675 (6th ed. 1990). Black's Law Dictionary continues to add that fungibles include "[m]ovable goods which may be estimated and replaced according to weight, measure, and number." Id. The Supreme Court of New Jersey has interpreted the term, "fungible," in the following manner:

> Fungible things are generally defined as interchangeable—capable of mutual substitution. They are of such a kind or nature that one specimen or part may be used in place of another specimen or equal part in the satisfaction of an obligation. The term is applied . . . in jurisprudence [] to things that in general are estimated in number, weight, or measure . . . .

Maritime Petroleum Corp. v. Jersey City, 1 N.J. 287, 295 (1949) (citations omitted).

Here, the Debtors argue that because the panels come in multiple sizes, the panels may be fungible within each respective size-class but are not fungible altogether. The JV Agreement, however, does not mention specific panel sizes but only deals in watts. See JV Agreement, Art. III, § 6(d) ("TS will contribute to the SPV all funds necessary to purchase all solar panels from [the Debtors] for the Project at a price of $1.60 per watt."). While the subsequent email chain between the Parties indicates that both 280W panels and 225W panels were being sold, it is clear based on the pricing of the contract and the fact that specific panel sizes were not contemplated in the contract that the Parties were ultimately dealing with the fungible item of watts. Fei acknowledged this at the November 20, 2014 Hearing:

> Q: And the panels are essentially mixed together, not distinguished? They're all watts, correct?
> A: Right.

11

Nov. 20 Hearing Transcript at 96:24-97:1 (Doc#63).

The Debtors draw an analogy that the 280W Panels are akin to the hanging fixtures in our courtroom while the 225W Panels are akin to the wall sconces in our courtroom—interchangeable among themselves but not among one another.  This analogy fails to acknowledge that, unlike the hanging fixtures and wall sconces in the courtroom, the panels *can* be estimated and replaced according to weight, measure or number.  This is undeniably true considering the panels were specifically designated and differentiated in terms of watts.  The panels could be substituted with one another according to the number of watts, and were fungible accordingly.  In fact, the contract itself recognizes this by only referring to watts when stating quantity and pricing terms.  While these panels come in different sizes, they are otherwise indistinguishable among one another and are explicitly valued by the quantity of watts, and priced by the exact same terms as one another.

Accordingly, the panels are fungible goods for the purposes of identification.  To reiterate, identification can occur in various ways, one of which is immediately upon contracting if the contract is for the sale of goods already existing and identified.  N.J.S.A. 12A:2-501(1)(a).  The fact that the quantity of a share in an identified bulk of fungible goods was not determined does not preclude identification.  N.J.S.A. 12A:2-105(4) ("[A]n undivided share in an identified bulk of fungible goods is sufficiently identified to be sold although the quantity of the bulk is not determined.").

Here, the transaction at the time of contracting referred to a bulk of fungible panels, for a sale at a rate of $1.60 per watt.  The fact that the quantity of watts was not determined until the later email chain occurred does not preclude identification.  The panels were sufficiently identified at the time of the JV Agreement even though the quantity of the bulk of fungible panels was not yet determined.  This conclusion coincides with the general policy of resolving all doubts in favor of identification.  N.J.S.A. 12A:2-501, UCC Comment 2.

### B.     Passing of Title

Part of the Debtors' argument is that the SPVs did not exist at the time of the JV Agreement, and therefore could not be a party to the contract for the purposes of the following analysis.  This argument ignores the very nature of the JV Agreement, which called for the

Debtors' creation of the SPVs so that they will purchase the solar panels from the Debtors in order to take advantage of tax benefits in the United States. A principal of Hessert, Mark Heenan ("Heenan") provided testimony that corroborates this, as Heenan discussed at length the investment tax credits that would be available to the Debtors through the SPVs' involvement in the solar projects. Moreover, the Debtors' position is undermined by the fact that the SPVs were created simultaneously with the execution of JV Agreement—both the JV Agreement was executed and the SPVs were established on October 25, 2011.

Though the issue has not been raised by the Debtors, the lack of a signed contract by the SPVs poses no statute of frauds issue, since this transaction falls outside of the signed-writing requirement because it was "with respect to goods for which payment has been made and accepted or which have been received and accepted." N.J.S.A. 12A:2-201(3)(c). There is no dispute here that the SPVs sent payments to Solergy and in turn to the Debtors. Each of the parties' conduct following the entering of the JV Agreement, including the SPVs, indicates that the SPVs recognized the JV Agreement and were acting in accordance therewith. See Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc., 401 B.R. 598, 621 (Bankr. S.D.N.Y. 2009) ("[T]he existence of a contract may be established through the conduct of the parties recognizing the contract.") (citing Apex Oil Co. v. Vanguard Oil & Service Co. Inc., 760 F.2d 417, 422 (2d Cir. 1985)). Of course there was no subsequent agreement between the SPVs and any of the parties—the SPVs were almost exclusively controlled by the Debtors and were created for the sole purpose of carrying out the terms of the JV Agreement.

As for passage of title, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ." N.J.S.A. 12A:2-401(2). "[T]he mere fact that the seller retains possession of the goods does not prevent concluding that title has passed to the buyer." Matter of GEC Industries, Inc., 128 B.R. 892, 898 (Bankr. D. Del. 1991) (interpreting Delaware's UCC, which is substantially similar to New Jersey's). In GEC Industries, the Delaware Bankruptcy Court concluded that under some circumstances delivery can occur despite the seller retaining possession of the goods. As the Delaware Bankruptcy Court explained:

> There may be a completed delivery although the goods remain in the possession of the seller if the seller's possession is as an agent or at the request of the buyer under an agreement to store and care

13

> for the goods; in such a situation, *there is a constructive delivery because there is nothing further to be done by either party to complete the sale.*

Id. (emphasis added). Relying on Delaware's version of N.J.S.A. 12A:2-401(3), the court concluded that title passed upon the issuance of an invoice.

There was no invoice in our case, however, and therefore for title to pass under N.J.S.A. 12A:2-401(3), this Court would have to rely on subsection (3)(b), which, provides that where "delivery is to be made without moving the goods, if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." N.J.S.A. 12A:2-401(3)(b). Fei admitted in his testimony that some portion of the funds retained by Solergy during the transactions was for warehousing costs. However, while the JV Agreement and SPVs both came into existence on the same day, given the lack of precise information as to the juxtaposition of the JV Agreement's execution and the SPVs' formation, concluding that title passed at the time and place of contracting could create an anomaly where title passed to the SPVs before they even existed. The Debtors substantially rely on this argument.

Fortunately, this Court need not entangle itself in this chicken-or-the-egg debate because there *was* a physical delivery of the panels. As noted above, N.J.S.A. 12A:2-401(2) provides that title passes once the seller completes his performance with respect to physical delivery unless the parties explicitly agree otherwise. Under subsections (2)(a) and (2)(b), the UCC adds that where the contract does not require delivery at destination, title passes at the time and place of shipment and, where the contract requires delivery at destination, title passes at said destination. N.J.S.A. 12A:2-401(2)(a)-(b). Here, the JV Agreement and the SPVs' certificates of formation were both executed on October 25, 2011. Thereafter, from the end of 2011 till mid-2012, the Debtors shipped panels to Solergy's warehouse, with the SPVs simultaneously making payments to the Debtors for the panels. Whether title passed at the time and place of shipment or at the destination itself is of no consequence, the destination contemplated for the panels was Solergy's warehouse and the panels reached said destination. Once the panels reached the warehouse here in New Jersey, the Debtors' performance with respect to physical delivery of the panels was completed, and title to the panels passed to the SPVs pursuant to N.J.S.A. 12A:2-401(2).

14

## V.   CONCLUSION

For all of the foregoing reasons, the SPVs obtained title to 7.34MW of panels, which includes the Set Aside Panels. The panels are the property of the domestic SPVs and not property of the Debtors' Estate pursuant to § 1521(a). It is hereby directed that Counsel for Hessert submit an order in conformance with this Opinion.

Dated: May 12, 2015

_____
GLORIA M. BURNS
JUDGE, U.S. BANKRUPTCY COURT